# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GIL A. MILLER, as Receiver for<br>IMPACT PAYMENT SYSTEMS, LLC,<br>and IMPACT CASH, LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>MARK TABER, an individual, HAMILTON KNOX CAPITAL GROUP, LLC, a California limited liability company, and HAMILTON KNOX MARKETING GROUP, LLC, a Utah limited liability company,<br><br>    Defendants. | **MEMORANDUM DECISION and ORDER GRANTING RECEIVER'S MOTION FOR SUMMARY JUDGMENT**<br><br>Civil No. 1:12-cv-74-DN<br><br>District Judge David Nuffer |

Defendants Mark Taber (Taber) and his companies Hamilton Knox Capital Group, LLC and Hamilton Knox Marketing Group, LLC (together, Hamilton Knox) introduced investors to Impact Payment Systems, LLC and Impact Cash, LLC (together, Impact), and in return were paid commissions and a salary. Plaintiff is the court-appointed receiver in *SEC v. Clarkl.*[1] The Receiver filed a motion for summary judgment[2] and the Defendants did not respond. To prevail on a motion for summary judgment the Receiver must show that there is "no genuine dispute as

---

[1] Case No. 1:11-cv-46-DN (Impact Payment Systems, LLC and Impact Cash, LLC are named defendants).

[2] Receiver's Motion for Summary Judgment and Memorandum in Support (Motion), filed November 22, 2013, docket no. 30.

to any material fact and that [the Receiver] is entitled to judgment as a matter of law."[3] This order grants the motion for summary judgment, declaring that the Defendants must return to the estate all funds they received from Impact, plus post-judgment interest.

## UNDISPUTED FACTS

The following factual statements from the Receiver's motion for summary judgment[4] are not disputed:

1. The Defendants received a total of $637,086 in payments from Impact, designated as payments for commissions and salaries.[5]

2. Defendant Hamilton Knox Marketing Group, LLC is a Utah limited liability company.[6]

3. Defendant Hamilton Knox Capital Group, LLC is a California limited liability company.[7]

4. Mr. Taber was a manager or member of the Hamilton Knox entities.[8]

5. This Court has already determined that Impact was operated as a Ponzi scheme.[9]

---

[3] Fed. R. Civ. P. 56(a).

[5] *See* Expert Report of David Bateman at 12, dated August 26, 2013 (Bateman Report), attached as Exhibit A to Motion, docket no. 30-1.

[6] *See* Defendants' Answer to Plaintiff's Complaint ¶ 6, filed November 30, 2012 (Answer), docket no. 21.

[7] *See id.* ¶ 7.

[8] *Id.* ¶ 5.

[9] *See* Order on Receiver's Motion to Approve Plan of Distribution at 4, ¶ 4, docket no. 184, filed May 11, 2012 and Order at 2, docket no. 360, filed April 10, 2013 (each filed in *SEC v. Clark*, Case No. 1:11-cv-46-DN).

6. Gil A. Miller was appointed as Receiver in this matter on March 25, 2011.[10]

7. Mr. Miller has concluded that Impact was operated with the characteristics of a Ponzi scheme since at least 2006.[11]

8. Mr. Miller and the accountants working with him conducted a thorough analysis of Impact's business operations and its accounting records. They relied on the contemporaneously kept records at Impact and on bank records obtained by subpoena.[12] A detailed description of the methods employed is contained in the expert reports of Mr. Bateman and of Gil A. Miller.

9. Impact commingled investor funds through intercompany and inter-account transfers.[13]

10. Impact's financial records were not audited by a reputable accounting firm.[14]

11. Although Impact purported to maintain balance records for each investor, those records were inaccurate. According to an e-mail from one of the accounting employees at Impact to Scott Clark, many of the investor accounts should have had negative cash balances. At

---

[10] *See* Expert Report of Gil A. Miller at 3, dated August 26, 2013 (Miller Report), attached as Exhibit B to Motion, docket no. 30-2.

[11] *See id.* at 6-12.

[12] *See* Bateman Report at 5; Miller Report at 13.

[13] *See* Bateman Report at 5-8.

[14] *See* Miller Report at 10-11.

the time of his e-mail, August 9, 2010, there was a total negative balance of more than $8.3 million.[15]

12. In order to make distributions to investors who had a negative balance, Impact's accountants would book entries in the accounting records labeled as "temp loans," effectively taking money that had been accounted for as belonging to one investor and paying it to another. In reality, no transfer of funds was necessary as all of the money was in a single account.[16]

13. Tori Jackson, who filled an accounting position with Impact, testified that distributions were sent to investors when companies had negative balances.[17]

14. Impact Payment Systems had losses totaling $1,056,055 as of December 31, 2009.[18]

15. Impact and its related companies did not show an operating profit in any year when distributions to investors were made. The Impact entities realized a collective net loss of nearly $3 million during that time. Nevertheless, they distributed over $52.6 million.[19]

16. When Impact's records include an appropriate bad debt adjustment, none of the $52.6 million in payments could have been made with operating profits. The only source for these distributions was from principal invested by other investors.[20]

---

[15] *See* Bateman Report at 8 & n.11.

[16] *See id.* at 8.

[17] Jackson Beutler Dep. 123:10, May 9, 2011 (relevant portions attached as Exhibit C to Motion, docket no. 30-3).

[18] *See* Bateman Report at 8.

[19] *See id.* at 11.

[20] *Id.*

17. Dirk Pace, an Impact accounting employee, testified that since he was hired by the company in September 2008, it recorded a loss each year and used investor money to cover those losses.[21]

18. One of Impact's accountants, Brandon Cowley, testified in his deposition that new investor money that was supposed to be used to fund payday loans came into Impact accounts and left the accounts within the same week to pay out old investors who had requested dividend payments or liquidation proceeds.[22]

19. Impact investors were promised large returns for their investments. Some investors were promised up to an 80% annual return. Others were told they would double their money in a year, or even within months. Investors were typically led to believe they were making between 30 and 40 percent in annual returns.[23]

20. Impact used investor funds that were supposed to be used for payday loans to cover expenses.[24]

21. Impact used investor funds to support Mr. Clark's standard of living.[25]

22. One person, Scott Clark, was principally responsible for Impact's operations.[26]

---

[21] Pace Dep. 17:12, October 7, 2011 (relevant portions attached as Exhibit D to Motion, [docket no. 30-4](#)).

[22] Cowley Dep. 28-29, May 24, 2011 (relevant portions attached as Exhibit E to Motion, [docket no. 30-5](#)).

[23] *See* Miller Report at 8.

[24] *See id.* at 10.

[25] *Id.*

[26] *Id.* at 11.

23. Mr. Taber, through Hamilton Knox, introduced more than 50 investors to Impact, representing $4,954,862 in investor funds.[27]

24. During his deposition, when asked whether he received commissions or other payments from Impact, Mr. Taber asserted his rights under the Fifth Amended and refused to answer the questions.[28]

25. Neither Mr. Taber nor the Hamilton Knox entities have ever been licensed to sell securities.[29]

### Fraudulent Transfer Law and the Ponzi Presumption

Under the Utah Uniform Fraudulent Transfer Act,

> [a] transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor; or without receiving a reasonably equivalent value in exchange for the transfer.[30]

The Receiver's burden of proving actual intent on summary judgment is conclusively established by proving the entities under his control were operated as a Ponzi scheme.[31] This Court has previously determined that Impact was operated as a Ponzi scheme, and reiterates that determination here.

---

[27] *See* Bateman Report, pages 12-13.

[28] Taber Dep. 9-10, September 28, 2011 (attached as Exhibit F to Motion, docket no. 30-6).

[29] *Id.* at 7; Answer ¶ 20.

[30] Utah Code Ann. § 25-6-5(1)(a), (b).

[31] *See Warfield v. Byron,* 436 F.3d 551, 558 (5th Cir. 2006) (citing *Scholes v. Lehmann,* 56 F.3d 750, 757 (7th Cir. 1995)).

Under the Uniform Fraudulent Transfer Act (UFTA), once it is established that a debtor acted as a Ponzi scheme, all transfers by that entity are presumed fraudulent.[32] The Defendants received payments of commissions and salaries for referring investors (the majority of whom are from California) to Impact. The commissions and salaries paid to the Defendants by Impact totaled $637,086 for the period of January 2007 through September 2010. Those who receive money for bringing new investors to a scheme have not given reasonably equivalent value within the meaning of the Uniform Fraudulent Transfer Act, and must return the money. "The primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferor's net worth is preserved."[33] "It takes cheek to contend that in exchange for the payments he received, the RDI Ponzi scheme benefited from his efforts to extend the fraud by securing new investments."[34]

In addition, the Defendants must return the commissions and salaries because they obtained them illegally. The Defendants have never been licensed to sell securities. Utah and California laws make it unlawful for any person to transact business in the state as a broker-dealer, agent, investment advisor, or investment advisor representative unless the person is licensed.[35] Willful violation is a third degree felony in Utah, and in California it carries a

---

[32] *See Wing v. Dockstader*, 482 Fed.App'x 361, 363 (10th Cir. 2012) (citing *Donnell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008)).

[33] Byron, 436 F.3d at 560 (citing *Butler Aviation Int'l, Inc. v. Whyte* (*In re Fairchild Aircraft Corp.*), 6 F.3d 1119, 1127 (5th Cir. 1993)).

[34] *Byron,* 436 F.3d at 560 (citation omitted); S*ee also, Dockstader*, 482 Fed.Appx. at 365-66 (citing *Byron* and upholding the district court's judgment against Mr. Dockstader which allowed the receiver to recover referral fees paid by the Ponzi entity).

[35] *See* Utah Code Ann. § 61-1-3(1) and (3) (2011); Cal. Corp. Code §§ 25210 and 25230 (2013).

potential fine of up to $1,000,000 and/or imprisonment.[36] In addition, a person selling a security in violation of these licensing laws must make the investor whole.[37]

"As other courts have recognized in the context of Ponzi schemes, courts generally will not enforce an illegal contract based upon 'the elementary principle that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction.'"[38] The Defendants participated in a violation of law by selling Impact securities without being properly licensed. They should not be allowed to benefit from the transactions.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."[39] Based on this standard, and for the reasons mentioned above, this Court grants the Receiver's motion for summary judgment.

## ORDER

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Receiver's Motion for Summary Judgment[40] is GRANTED.

---

[36] *See* Utah Code Ann. § 61-1-21(1)(a); Cal. Corp. Code § 25540(A).

[37] *See* Utah Code Ann. §61-1-22(1)(a)-(c); Cal. Corp. Code § 25501.5(a) and (b).

[38] *Sender v. Simon*, 84 F.3d 1299, 1307 (10th Cir. 1996) (quoting, among others, *Merrill v Abbott,*(In *re Independent Clearing House)*, 77 B.R. 843, 857 (D. Utah 1987)).

[39] Fed. R. Civ. P. 56(a).

[40] Docket no. 30, filed November 22, 2013.

IT IS FURTHER ORDERED that defendants Mark Taber, Hamilton Knox Capital Group, LLC and Hamilton Knox Marketing Group, LLC, jointly and severally, must return $637,086 to the receivership estate, plus interest at the statutory post-judgment rate pursuant to 28 U.S.C. §§ 1961(a) and 1961(b).

Signed January 28, 2014.

BY THE COURT

_____
District Judge David Nuffer